[No. 27070. Department Two. November 4, 1938.]

N. C. INGRAM, *Respondent,* v. CLARK ALDRICH, *Appellant.*[1]

[1]Reported in 83 P. (2d) 917.

*Allan Trumbull* and *Trumbull, Severyns & Trumbull,* for appellant.

*Rummens & Griffin,* for respondent.

MILLARD, J.—As the alleged owner of the property, N. C. Ingram instituted a replevin action against the Foss Company to recover possession of a number of rafts of cedar logs in storage with that company. Clark Aldrich, who also claimed to be the owner of the subject-matter of the controversy, was made an additional party defendant. Pursuant to a stipulation between the parties, the logs were sold and the proceeds—less the amount of the cost of the sale and the storage charges paid to the Foss Company, which party was thereupon dismissed from the action—of that sale were deposited in the registry of the court to abide the outcome of the contest between plaintiff, Ingram, and defendant Aldrich as to the ownership of the fund. The trial court found, briefly, as follows:

Under the provisions of a stumpage contract with plaintiff, Joe Rush logged certain lands owned by plaintiff during the months of July to September, 1933. The logs, which were cedar, cut by Rush were rafted by him in Ludlow Bay, Clallam county, and October 12, 1933, Rush sold and delivered to plaintiff all of those cedar logs except one, the ownership of which is not in question in this action. In May, 1934, plaintiff employed the Wagner Tug Boat Company to tow his logs from Ludlow Bay to the towing company's place of storage in Lake Washington, King county. In the same tow, the tug boat company transported to the same place of storage cedar and fir logs owned by Clark Aldrich. In October, 1934, the logs were

driven from their boom by a severe storm, and some of the logs of each of the parties were lost. Without plaintiff's knowledge, Aldrich had his logs and the logs owned by plaintiff removed April 28, 1936, from the Wagner Tug Boat Company's storage to Lake Union for storage with and sale by the Foss Company.

Prior to the sale, Ingram instituted this replevin action against Foss Company, which denied ownership of the logs and alleged that it was holding the logs simply as bailee for Aldrich, who was then made an additional party defendant. Pursuant to stipulation of the parties, the logs were sold and the net proceeds of the sale deposited in the registry of the court.

The court further found that, of the logs sold, 103,-290 feet of cedar logs in controversy were the property of Ingram, and that 7,103 feet of logs, ownership of which was conceded, were the property of Aldrich; that the fund (after payment of filing and attorney's fees, amounting to $53, of the Foss Company) of $921.95 in the registry of the court should be prorated between Ingram and Aldrich—$782.06 to Ingram and $86.89 to Aldrich. From the judgment rendered in consonance with the foregoing, Aldrich has appealed.

Appellant states, in effect as follows, the theory of his acquisition of title to the cedar logs in controversy:

A copartnership designated the Dabob Logging Company, consisting of John Bolan and wife, Joe Rush, and other members of the Bolan family, financed by appellant, logged respondent's lands. The cedar logs claimed by appellant and respondent are a portion of those taken off of respondent's lands by the copartnership and were dumped in the same boom as had been used by the copartnership in other logging operations. During the operations, the Bolans executed chattel mortgages to secure payment of the indebtedness to appellant.

In the fall of 1933, John Bolan's wife, the financial manager of the copartnership, executed a bill of sale to the appellant covering the subject-matter of this controversy in order to secure payment to appellant of thirty-five hundred dollars then owing to appellant by the copartnership. In 1934—subsequent to the death of Mrs. Bolan—John Bolan executed a bill of sale and release to the appellant covering the logs in question. That is, under a stumpage contract with respondent, the copartnership acquired title to the logs, and by virtue of the chattel mortgage and two bills of sale described above, executed by the copartnership to appellant, the latter became owner of the logs.

The evidence, summarized as follows, amply sustains the court's finding that, at all times from October 12, 1933, until sale of the logs pursuant to the stipulation between the parties, respondent was the owner and entitled to possession of the cedar logs:

Respondent, a timber cruiser, has owned lands in Jefferson county for many years. Prior to the logging contract of Joe Rush with respondent, the Dabob Logging Company logged some of the lands of respondent. On April 22, 1932—more than a year before Joe Rush commenced operations under his logging contract with respondent—the Bolans (Dabob Logging Company) acknowledged in writing final payment under, and cancellation of, their contract of July 21, 1930, with respondent. No further business dealings were ever had by Ingram with the copartnership.

Joe Rush, a step-son of John Bolan, but not interested in the Dabob Logging Company, entered into a contract May 29, 1933, to log respondent's land described as the "S½ SW¼, Section 11, Township 28, North, Range 1 West." Rush agreed to pay respondent stumpage at $2.50 per thousand feet, water scale,

the logs to be dumped into Ludlow Bay. Respondent advanced, during the logging operations, which covered both fir and cedar, an aggregate of $1,005 to Rush. While the logging operations were in progress, Rush sold the fir logs. On October 12, 1933, at which time Rush was heavily indebted to respondent, the latter bought the cedar logs from Rush and took immediate possession of same. The bill of sale of October 12, 1933, from Joe Rush to respondent was not placed of record in the office of the auditor for Jefferson county until May 14, 1935. While Rush used some of the Dabob Logging Company's equipment for logging respondent's land, he paid rental to the copartnership for use of that equipment.

In 1934, at which time appellant had five sections of fir and one raft of cedar logs in Ludlow Bay, which logs were the result of logging operations by the Bolans —*not Rush*—on appellant's lands and not on respondent's lands, respondent's logs were towed to Lake Washington by the Wagner Boat Company. At appellant's request, respondent permitted appellant's logs to be towed at the same time. That is, all of the logs came in as a single tow to Lake Washington and were billed without segregation jointly to appellant and respondent. Some of the logs were lost from the boom in a severe storm on the lake. Without the knowledge of respondent, appellant paid the towing charges to the Wagner Tug Boat Company on all the logs and had the Foss Company tow the logs remaining after the 1934 storm to the pool of the Foss Company in Lake Union and directed that company to sell the logs.

The cedar logs in controversy were cut on respondent's land by Rush under a stumpage contract with respondent, and the Dabob Logging Company had no interest in the contract. At the time of the delivery of the logs by Rush to Ingram at Ludlow Bay, the appel-

lant did not have any logs in the bay. On January 13, 1933, when Mrs. Bolan, financial manager of the Dabob Logging Company, executed a mortgage to appellant in the amount of thirty-five hundred dollars on certain timber, which mortgage purports to cover logs in Ludlow Bay, there were no logs, so appellant testified, at that time from off the property of respondent in Ludlow Bay. The mortgage also recites that it covers only timber removed by the mortgagor from section 12 and not section 11, which was owned by respondent and logged by Rush. In other words, the mortgage of January 13, 1933, by Mrs. Bolan to appellant to protect the indebtedness in the amount of thirty-five hundred dollars that the Dabob Logging Company owed to appellant describes the land from which stumpage is payable; but that description is not of, and does not purport to cover, the land (section 11) of respondent.

On October 28, 1933, Mrs. Bolan, who was suffering from a cerebral hemorrhage and who died two or three days thereafter, executed a bill of sale to the appellant covering 140,000 feet of cedar logs. The exhibit is a certified copy of the bill of sale, the original having been lost prior to the trial.

On March 31, 1934, five months subsequent to the death of Mrs. Bolan, John Bolan signed individually, and not as administrator of estate of his deceased wife, a purported bill of sale to appellant for cedar logs.

■ There is evidence that Mrs. Bolan on October 28, 1933, could not write because of her physical condition and was mentally incapable of executing the bill of sale, one of the links in appellant's alleged chain of title to the logs. It is not necessary to impugn the integrity of anyone. The mortgage executed by Mrs. Bolan to appellant January 13, 1933, does not cover the logs in controversy. The bill of sale dated Octo-

ber 28, 1933, as well as the attempted bill of sale of March 31, 1934, could not have vested title to the logs in appellant, because prior thereto—October 12, 1933 —the logs were sold and delivered by Rush, then owner of the logs, to respondent, who never parted with title to the logs until they were sold by the Foss Company pursuant to stipulation as above recited.

Appellant's contention that the bill of sale of October 12, 1933, from Joe Rush to respondent is not valid against the claim of appellant because it was not recorded within ten days after the sale was made, and Aldrich was an innocent purchaser, is without merit. The statute,

"No bill of sale for transfer of personal property shall be valid, as against existing creditors or innocent purchasers, where the property is left in the possession of the vendor, unless the said bill of sale be recorded in the auditor's office of the county in which the property is situated, within ten days after such sale shall be made." Rem. Rev. Stat., § 5827 [P. C. § 7747].

is applicable only where the property is left in possession of the vendor. The vendor (Rush) delivered the property to respondent (vendee), who took possession on October 12, 1933, which definitely determines the question as to the date—October 12, 1933—respondent became owner of the logs.

The contention of appellant that respondent's acquiescence in the former's claim of title estops respondent from asserting any superior claim, is without substantial merit. It was not until after the storm in October, 1934, while the logs were in Lake Washington and both parties were recapturing their logs, that appellant casually remarked that he had some claim to the logs, whereupon he was advised by respondent to refrain from making any such claim. The respondent did not believe appellant was serious in this until his

logs, without his consent, with the 7,103 feet of logs of appellant, were removed by appellant to the Foss Company's pool.

Appellant contends that the lien claim of Joe Rush in the amount of $20, payment of $15 to a watchman, towing charges of $101.95, and industrial insurance premiums of $81.65, in addition to $150 representing the value of boom sticks and boom chains turned over to the Wagner Tug Boat Company at the time the logs were removed, should be paid to him.

There was no relationship between the parties on which to base an estoppel as claimed by appellant. Respondent was not guilty of any misrepresentation or fraud. With full knowledge of respondent's ownership of the logs, and after the respondent's bill of sale was actually filed, and when the Wagner Tug Boat Company would not sell the logs for him, the latter voluntarily paid the towage charges on all of the logs which he had transferred to the Foss Company. He then endeavored to have that company sell the logs without knowledge on its part of the claim of the respondent and without notice to the respondent. In *Maxwell v. Dimond,* 83 Wash. 30, 145 Pac. 77, quoting from *Rowe v. James,* 71 Wash. 267, 128 Pac. 539, we said:

" 'The basis of all estoppel *in pais* is that there is one innocent party and one negligent or wrongdoing party, and the doctrine means that, when the innocent party has been induced to surrender a valuable right or to change his position to his prejudice relying upon the acts or representations of the negligent or wrongdoing party, then the latter will not be heard to assert the falsity of his acts or representations to the prejudice of the former.' "

Joe Rush had a lien claim against appellant. Respondent learned that the claim could be settled for twenty dollars. As a friend of the parties, he so ad-

vised appellant and satisfied the claim for twenty dollars. An examination of the evidence does not elicit whether the industrial insurance covered the logs in controversy. The industrial insurance premiums, it is clear, were in payment for additional logs of previous years, but there is no segregation of amounts. The trial court said:

"There is no segregation of these various items to which I could place any figure on as to make the segregation which the plaintiff could pay.

"As I have stated, I don't know of anything that the plaintiff has done which would lead this defendant to honestly believe that the particular logs in question were any other than his. And if I thought that he had, and deceived the defendant thereby, that would be one thing. But I cannot so hold."

The trial court allocated the proceeds from the sale made pursuant to the stipulation of the parties as between respondent's logs and the logs of appellant, and distributed the fund accordingly.

The judgment is affirmed.

STEINERT, C. J., BEALS, GERAGHTY, and SIMPSON, JJ., concur.